**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| **JENNIFER N.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:22-cv-391** |
| ) | |
| **KILOLO KIJAKAZI,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Jennifer N. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 11.

Presently before the Court are the parties' cross motions for summary judgment. ECF Nos. 15, 17. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 15, be **DENIED**, the Commissioner's Motion for Summary

Judgment, ECF No. 17, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for DIB on December 30, 2019, alleging disability due to diabetes, fibromyalgia, endometriosis, polycythemia, depression, and anxiety. R. at 118–19.[1]   Plaintiff's application was initially denied on July 23, 2020, and was denied upon reconsideration on December 11, 2020. R. at 154, 167. On January 8, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 175.

A hearing was held on September 9, 2021, at which Plaintiff appeared with counsel before Administrative Law Judge Suzette Knight ("the ALJ"). R. at 91–117.   Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 98–116. On September 29, 2021, the ALJ issued a decision finding Plaintiff not disabled. R. at 10–21. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on July 19, 2022, making the ALJ's decision the final decision of the Commissioner. R. at 1–6.

Having exhausted her administrative remedies, Plaintiff filed a Complaint for judicial review of the Commissioner's decision on September 16, 2022. ECF No. 1. On January 17, 2023, Plaintiff filed a Motion for Summary Judgment and accompanying brief in support. ECF Nos. 15–16.   On February 15, 2023, the Commissioner filed a Motion for Summary Judgment and memorandum in support. ECF Nos. 17–18. Plaintiff filed a reply on February 28, 2023. ECF No. 19. Because the motions are fully briefed, the matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

---

[1] "R." refers to the certified administrative record that was filed under seal on November 16, 2022. ECF No. 10, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

Plaintiff alleges disability due to: diabetes, fibromyalgia, endometriosis, polycythemia, depression, and anxiety. R. at 118–19. Plaintiff was forty-seven years old at the time of her alleged disability onset date, May 31, 2020.[2] R. at 96, 118. Plaintiff completed high school and previously worked as a secretary and as a vice president of sales. R. at 100–02, 228. Plaintiff lives with her husband and does not currently work. R. at 99.

## A. Medical Records Relevant to Plaintiff's Alleged Physical and Mental Impairments

By way of background, Plaintiff received treatment from two primary care physicians and an endocrinologist for symptoms related to uncontrolled diabetes mellitus ("DM") and was treated with insulin medications and an insulin pump. *E.g.,* R. at 334, 338, 341, 344, 525, 787, 1294. Plaintiff also has depression and anxiety, which her physicians treated with anti-depressant and anti-anxiety medication, prescribed consistently throughout the relevant period. *E.g.,* R. at 341, 430–31, 497–98. The record does not include documentation from mental health professionals. Plaintiff also has endometriosis and had a laparoscopy in 2000 to treat this, R. at 465, and Plaintiff has fibromyalgia and polycythemia, R. at 327. The medical record also includes various procedures and tests, including an upper GI endoscopy, biopsies, lab work, and imaging. *E.g.,* R. at 357–58, 392–93, 404–05, 441, 843. The specialists identified only minor abnormalities, and the specialists quickly discharged Plaintiff with no additional treatment. *E.g.,* R. at 439, 557, 845. Plaintiff presented at the emergency room multiple times and each time was discharged without additional treatment: once for a fall related to intoxication, R. at 325, twice for diabetic ketoacidosis ("DKA") after missing several doses of insulin, R. at 552, 880, and once after a seizure, R. at 850.

The undersigned now recounts Plaintiff's medical records in greater depth by time period.

---

[2] Plaintiff originally alleged her disability onset date was July 1, 2019, R. at 118, but during her hearing with the ALJ, Plaintiff amended her alleged disability onset date to May 31, 2020, R. at 96.

### 1. Primary care physician Dr. Ryan Van Gomple and endocrinologist in 2019

Dr. Ryan Van Gomple was Plaintiff's primary care provider until December 2019. *E.g.* R. at 334–358. Dr. Van Gomple treated Plaintiff for DM type 2, hypertension, hypercholesterolemia, vitamin B12 deficiency, unintentional weight loss, and polycythemia. R. at 338, 341, 344. To treat Plaintiff's diabetes, Dr. Van Gomple prescribed Lantus (long-acting insulin) and Novolog (an insulin medication). R. at 341, 343.

While under Dr. Van Gomple's care, Plaintiff underwent a variety of tests and scans. In January 2019, Plaintiff had lab work and a CT scan. R. at 358–60. The CT showed an increase in the size of a lung nodule, interval development of hepatomegaly with subcapsular fibrotic change, diffuse hepatic steatosis, hypodensities in the spleen, calcifications in the pancreas, and new nonspecific fold thickening with the jejunum. R. at 416. In January 2019, Plaintiff had a follow-up PET scan, which showed the lung nodule was not consistent with cancer. R. at 357. In January 2019, Plaintiff had an abdominal MRI that showed a nodule in her left lung, potential fibrosis in the liver, and conspicuous foci of hypoenhancement in the spleen. R. at 409. In March 2019, Plaintiff had a colonoscopy that showed normal findings, R. at 406–07, and an endoscopy that was unremarkable, R. at 403–05. A follow-up chest CT in October 2019 showed a mild increase in the size of Plaintiff's lung nodule, which was found to be consistent with a benign or non-cancerous process. R. at 339.

In November 2019, Plaintiff saw Sharon Rhodes, FNP, with TPMG endocrinology for type 2 DM with hyperglycemia. R. at 305–11. Plaintiff reported her blood sugar being erratic, weight loss, and waking up with blood sugar lows with sweating and disorientation. R. at 307. Plaintiff reported that while she was compliant with medication and had stopped drinking, her blood sugar remained erratic. R. at 307. Plaintiff referred herself to Rhodes and Rhodes increased Plaintiff's

dose of Lantus and started prescribing Januvia (a medication that increases insulin production).  R. at 306–07.

In December 2019, Dr. Van Gomple was preparing to leave his practice, so Plaintiff requested he complete disability paperwork.  R. at 336.  At her appointment for medical forms in December 2019, Dr. Van Gomple reported Plaintiff's primary reason for disability was uncontrolled DM and unexplained weight loss that impaired her daily function.  R. at 335.  Dr. Van Gomple also noted Plaintiff was seeking disability due to fibromyalgia, anxiety, and polycythema.  R. at 335.  Dr. Van Gomple completed the forms as requested and "made clear" to Plaintiff that he would "not be completing any future paperwork regarding her disability case [and] [i]n the future [would] defer to her new [primary care physician] and/or specialists."  R. at 335.

### 2. Oncologist and hospitalization for intoxication-related fall, January and February 2020

On January 3, 2020, Plaintiff was admitted to a Sentara emergency room because of intoxication, a fall, and reported pain all over due to fibromyalgia.  R. at 325.  Plaintiff had a cervical spine CT, which showed no acute fracture or subluxation of the cervical spine, but identified multilevel degenerative changes.  R. at 331.  Plaintiff also had a head CT that showed no evidence of an acute intracranial abnormality or other findings related to recent trauma, but did show mild cerebral atrophy/volume loss and periventricular white matter changes, most commonly seen with chronic microvascular disease.  R. at 331.  Plaintiff's blood-alcohol level was 0.44, and doctors suspected Plaintiff developed a tolerance through continuous drinking given her high-level functioning.  R. at 326.  Doctors also noted Plaintiff's speech was normal, grip strength was normal and symmetrical, leg lift was intact, and sensations to touch were intact throughout bilateral upper and lower extremities.  R. at 327.  Doctors treated Plaintiff with intravenous fluids and general observation and she was discharged that day.  R. at 326, 332.

5

After hospitalization, Plaintiff underwent tests recommended by an oncologist, Dr. Alexander Burton. *E.g.,* R. at 441, 445. Dr. Burton reported Plaintiff had no diseases, R. at 437: an abdominal CT provided no findings and that her lung nodule was stable, lab work showed elevated liver enzymes related to alcohol, and a bone marrow biopsy showed no detectable flow cyometric evidence of a B-cell or T-cell lymphoid neoplasm, or acute leukemia and maturing granulocytic/monocytic elements exhibit no diagnostic antigenic aberrancles. R. at 449, 461–62; her liver and spleen appeared normal, R. at 441–48; and a bone marrow biopsy came back normal, R. at 449–60. The oncologist reported the abnormal liver tests were caused by alcoholism and discharged Plaintiff from his care with no further treatment. R. at 439. He told Plaintiff to stop drinking but to otherwise return to normal activity. R. at 439.

Plaintiff had appointments in January and February 2020 with the oncologist, Dr. Burton F. Alexander. R. at 441, 464. Plaintiff is an hemochromatosis carrier and has secondary polycythemia. R. at 464. At one appointment in January 2020, Plaintiff had a bone marrow biopsy that was non-specific compatible with secondary polycythemia. R. at 437. Plaintiff's CT scan in January 2020 showed no new findings or change and showed the nodule in her left lung was stable. R. at 437. Plaintiff's liver biopsy in January 2020 showed mild steatosis, mild lobular inflammation suggesting prior liver injury, but no evidence of significant fibrosis and no malignancy. R. at 843.

### 3. *New primary care physician, Dr. Katherine Stachowicz, February 2020*

In February 2020, Plaintiff began regular appointments with a new Sentara primary care physician, Dr. Katherine Stachowicz. R. at 562. Dr. Stachowicz referred Plaintiff to pulmonology for lung nodule and endocrinology for an insulin pump. R. at 562. In March 2020, Dr. Mary

Barker, with Pulmonary and Critical Care Medicine at Norfolk Diagnostic Center, reviewed Plaintiff's prior imaging and labs and concluded she was at low suspicion for cancer. R. at 557.

### 4. First hospitalization for diabetic ketoacidosis, May 2020

On May 31, 2020, Plaintiff went to a Sentara emergency room for vomiting and reported she had not taken insulin for one week. R. at 512–13. Plaintiff was diagnosed with diabetic ketoacidosis ("DKA") and treated with insulin and fluids. R. at 534, 552. After conducting tests, doctors concluded Plaintiff had developed DM type 1 and started her on Lantus and Humalog (fast-acting insulin). R. at 534. After two days in the hospital, doctors discharged Plaintiff with no noted symptoms or further treatment. R. at 553.

### 5. Follow-up and treatment, June 2020 through September 2020

In June 2020, Plaintiff had a hospital discharge follow-up appointment with Dr. Stachowicz who increased Plaintiff's Zoloft prescription and refilled Plaintiff's Lorazepam prescription. R. at 497–98. Plaintiff saw Dr. Stachowicz again in September 2020 for anxiety, needing a flu shot, gastroesophageal reflux disease, and hypertension associated with diabetes. R. at 800–01. Dr. Stachowicz refilled Plaintiff's prescriptions for Lorazepam and Sertraline for her anxiety, refilled Plaintiff's prescription for Omeprazole for her gastroesophageal reflux disease, and refilled Plaintiff's prescription for Lisinopril for her hypertension associated with diabetes. R. at 800–01.

Plaintiff returned to Dr. Stachowicz in September 2020. R. at 800. Plaintiff's chief complaint was continued anxiety and needing a flu shot, and Dr. Stachowicz reported also assessing her for hypertension and reflux. R. at 800. Dr. Stachowicz continued all medications and recommended following-up in three months. R. at 800–01.

6. *Treatment with new endocrinologist, Dr. Jennifer Wheaton, September 2020 through November 2020 and well-woman appointment*

Plaintiff began receiving treatment from a Sentara endocrinologist, Dr. Jennifer Wheaton, in September 2020 for type 1 DM with complication and diabetic peripheral neuropathy associated with type 1 DM. R. at 793. Plaintiff had another appointment with Dr. Wheaton in October 2020 and she increased Plaintiff's Lantus prescription and prescribed Humalog before each meal. R. at 787. Plaintiff checked-in over the phone with Dr. Wheaton throughout November and December 2020 and Dr. Wheaton continued increasing Plaintiff's insulin and Plaintiff requested an insulin pump. R. at 783–85.

In the meantime, on November 3, 2020, Plaintiff attended a well woman's appointment with her gynecologist. R. at 834. Plaintiff reported fatigue, vision changes, vaginal pain, bleeding with intercourse, muscle aches and weakness, but other than being thin, her doctor noted no significant symptoms. R. at 837. No treatments were rendered, and they recommended she return in a year. R. at 838.

7. *Second hospitalization for diabetic ketoacidosis and follow-up with oncologist, December 2020 through February 2021*

On December 26, 2020, Plaintiff went to the emergency room after missing insulin doses and reported nausea, vomiting, shortness of breath, and high glucose. R. at 860. Doctors treated Plaintiff with intravenous fluids and insulin and diagnosed her with DKA. R. at 878, 880. Plaintiff was discharged after three days with no additional treatment and was told to follow-up in a week with her primary care physician. R. at 882–83. However, Plaintiff did not schedule an appointment with her primary care physician, and she did not attend her follow-up appointment with endocrinologist Dr. Wheaton on January 20, 2021. R. at 1320.

8

Plaintiff completed a follow-up liver biopsy in January, as ordered by the hospital, and she attended a follow-up appointment with her oncologist Dr. Burton in February 2021. R. at 843. Upon examination, the oncologist noted no significant symptoms and noted plaintiff exhibited 5/5 motor strength and symmetrical, normal reflexes (2+), and normal gait. R. at 843. The liver biopsy showed mild steatosis, mild lobular inflammation suggesting prior injury, and no significant fibrosis or malignancy. R. at 843. Dr. Burton did not order follow-up treatment. R. at 845.

### 8. *Treatment with endocrinologist and primary care physician, April 2021*

On April 9, 2021, Plaintiff attended an appointment with Dr. Stachowicz. R. at 1202. Prior to this appointment, Plaintiff received an insulin pump, but Plaintiff still reported anxiety because her blood sugar continued to be erratic, and she sweated excessively when hypoglycemic. R. at 1205. Dr. Stachowicz assessed Plaintiff for anxiety, uncontrolled DM type 1, hyperglycemia, hypertension, and tachycardia. R. at 1205. Though Dr. Stachowicz reported no significant symptoms, she determined Plaintiff's pump required immediate adjustment, and Plaintiff could not wait until her endocrinology appointment the following Monday. R. at 1205.

In April 2021, Dr. Wheaton reported Plaintiff was experiencing too many low blood sugar readings, but her DM type 1 with neuropathy was overall stable and her blood sugars improved significantly since starting the insulin pump and adjusted the insulin pump settings. R. at 1310. Further, Dr. Wheaton found Plaintiff's hypertension was well-controlled, but Plaintiff's hypercholesterolemia was chronic and uncontrolled. R. at 1310.

### 9. *Hospitalization for seizure and follow-up with primary care physician, June 2021*

On June 28, 2021, Plaintiff presented to the emergency room after experiencing a seizure and Plaintiff was advised about signs and symptoms of seizures and told to return if she experienced any new or worsening symptoms. R. at 850. Upon discharge, hospital doctors advised

Plaintiff not to drive and ordered no other treatment. R. at 850. At a follow-up telehealth appointment in July 2021, Plaintiff's primary care physician, Dr. Stachowicz, noted Plaintiff exhibited generalized weakness and headaches and referred her to a neurologist. R. at 1187–88. Because of a six to seven month wait for a neurology appointment, Plaintiff requested options to see a neurologist sooner. R. at 1188.

*10. Treatment with endocrinologist, July 2021.*

At Plaintiff's next appointment with her endocrinologist, Dr. Wheaton, in July 2021, Plaintiff reported low blood sugar episodes when her pump loses connectivity. R. at 1295. Dr. Wheaton determined Plaintiff's blood sugar was generally well-controlled but there were more low blood sugar readings than she wanted to see. R. at 1294–95. Dr. Wheaton adjusted Plaintiff's pump settings and recommended she return in three months. R. at 1294.

## B. Relevant Medical Opinion From Primary Care Physician, Dr. Ryan Van Gomple

In December 2019, Dr. Van Gomple prepared to leave his practice, and Plaintiff requested he complete her disability forms. R. at 336. Plaintiff visited Dr. Van Gomple's office so he could examine her and complete the forms. R. at 335. On the medical statement form Plaintiff provided, Dr. Van Gomple wrote Plaintiff's medical conditions included uncontrolled diabetes, unintentional weight loss, fibromyalgia, anxiety, abnormal liver tests, and polycythemia. R. at 316. Dr. Van Gomple reported Plaintiff had symptoms of these conditions: lower back, neck, knee, shoulder, ankle, hand/wrist, and hip pain; multiple trigger/tender points; muscle spasms and weakness; pain/numbness in arms and legs; shortness of breath; depression or anxiety; and severe fatigue or malaise. R. at 316. As a result of Plaintiff's diabetes, Dr. Van Gomple reported Plaintiff has chronic and severe fatigue, malaise, weight change, increased thirst, and increased urination. R. at 317. Dr. Van Gomple also reported Plaintiff can frequently lift and carry ten pounds, can

occasionally lift and carry twenty pounds, and can never lift and carry fifty pounds. R. at 316. Dr. Van Gomple reported Plaintiff does not need to use a cane or assistive device and does not need to elevate her legs at or above waist-level for at least fifteen percent of the day. R. at 316. Dr. Van Gomple reported Plaintiff can: sit, stand, or walk about two hours of an eight-hour workday; frequently reach, handle, grasp, use fingers with both hand or arms; and walk two to three blocks without rest. R. at 316. Dr. Van Gomple opined Plaintiff would be absent from work four or more days per week and require unscheduled breaks four or more times per day for at least fifteen minutes. R. at 316. Dr. Van Gomple made no notes on the form referring to Plaintiff's records, and he made no notes in her records referring to the conclusions on the form. R. at 316–17.

## C. Relevant Physical and Mental Evaluations Completed by State Agency Examiners

At the initial level, state agency examiner Dr. Gene Godwin, reviewed Plaintiff's medical records. R. at 118–28. Dr. Godwin determined Plaintiff has light residual functional capacity. R. at 127. Dr. Godwin found Plaintiff can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and push and/or pull unlimited. R. at 124. Dr. Godwin reported Plaintiff is able to climb ramps/stairs, balance, and crouch frequently and climb ladders/ropes/scaffolds, stoop, kneel, and crawl occasionally. R. at 125. Dr. Godwin found Plaintiff has no manipulative, visual, or communicative limitations, but that Plaintiff does have environmental limitations. R. at 125. Dr. Godwin opined Plaintiff has a history of uncontrolled DM, polycythemia, and fibromyalgia and has chronic fatigue and pain. R. at 126. Dr. Godwin opined Plaintiff's "main deficit is relating to pain and fatigue." R. at 126.

At the reconsideration level, state agency examiner Dr. Robert McGuffin reviewed Plaintiff's medical records. R. at 131–46. Dr. McGuffin found Plaintiff had light residual

11

functional capacity. R. at 144. Dr. McGuffin agreed with Dr. Godwin's findings about Plaintiff's exertional, postural, and environmental limitations. R. at 141–42. Dr. McGuffin also opined Plaintiff's "main deficit is relating to pain and fatigue." R. at 143.

### D.    Plaintiff's Testimony at ALJ Hearing

At the ALJ hearing on September 9, 2021, Plaintiff testified to background and personal information, her symptoms, and the effect of those symptoms on her daily life. R. at 98–112. Plaintiff is married and lives with her husband and their dog in a two-story condo with their bedroom on the first floor. R. at 98–99. Plaintiff completed high school and is not currently working. R. at 99–100. Due to a recent seizure, Plaintiff was ordered to not drive for six months. R. at 100. On good days, which occur about twice a week, Plaintiff is able to do a load of laundry or make a quick meal. R. at 112. Plaintiff does not have hobbies, does not dine out or visit with friends and family, and does not go to church or the mall. R. at 106. Before she had trouble focusing, Plaintiff loved reading books and cooking magazines. R. at 100–01. Plaintiff's neuropathy affects her ability to hold pens, iPads and books, knives, and prevents her from standing to prepare meals. R. at 111.

Plaintiff's typical day begins telling her husband goodbye as he leaves for work and she then goes back to bed and either sleeps or watches television for most of the day. R. at 104. Plaintiff has no trouble with her personal care matters such as dressing, grooming, or using the bathroom, but does not shower unless her husband is home. R. at 105. As to her ability to take care of herself and her house, Plaintiff lets her dog out to use the bathroom, does laundry, goes grocery shopping with her husband, but does not do yardwork or household chores. R. at 105–06.

Plaintiff is not able to work because her sugar levels are out of control, so she sleeps a lot. R. at 103. When Plaintiff's blood sugar drops extremely low, she is "semi-conscious" or

"nonresponsive." R. at 108.  When Plaintiff has low blood sugar but not an extreme low, which happens twice a week, she is disoriented, not able to do much, and experiences sweating, lightheadedness, dizziness, and vomiting. R. at 109–10.  Plaintiff is unable to sleep at night due to her neuropathy, which makes her blanket feel like pins and needles on her feet. R. at 110. Plaintiff has general anxiety throughout the day, which prevents her from working. R. at 104. Plaintiff has not sought treatment from a mental health professional because she cannot afford it. R. at 104.

### III.  THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process.   § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation).  At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity.  § 404.1520(a)(4)(i).  At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  § 404.1520(a)(4)(iii).  If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments.  § 404.1545(a).  At step four, the ALJ considers whether the claimant can still perform past relevant work given her residual functional capacity.  § 404.1520(a)(4)(iv).  Finally, at step five, the ALJ considers whether the claimant can perform other work.  § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of May 31, 2020. R. at 12. At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, fibromyalgia, polycythemia, and seizure. R. at 12. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 14–15.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the following limitations: can frequently balance, crouch, or climb ramps and stairs; can occasionally stoop, kneel, crawl, or climb ladders, ropes, or scaffolds; can tolerate occasional exposure to hazards – such as unprotected heights and machinery that has open moving mechanical parts; and can never operate a motor vehicle for commercial purposes. R. at 15.

14

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." R. at 15. The ALJ also "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." R. at 15.

At step four, the ALJ determined Plaintiff was capable of performing her past relevant work as an accounting clerk because it only entailed sedentary exertion. R. at 19–20. The ALJ found Plaintiff is not capable of performing her past work as a vice president of sales. R. at 20. Though office management work required only light exertion, the job also involved a truck driving component, which exceeded the requirements of Plaintiff's residual functional capacity. R. at 20. At step five, the ALJ determined Plaintiff can perform other jobs that exist in significant numbers in the national economy. R. at 20. Thus, the ALJ determined Plaintiff was not disabled from the alleged onset date, May 31, 2020, through the date of the ALJ's decision, September 29, 2021. R. at 21.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "'evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at

589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio*, 780 F.3d at 637.

In determining whether the ALJ's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589. If "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff appeals to this Court on the sole assertion that the ALJ "failed to properly evaluate the opinion of treating physician, Ryan Van Gomple, M.D." ECF No. 16 at 7. However, based on the Plaintiff's brief, the Court interprets Plaintiff to also argue the ALJ improperly evaluated Plaintiff's subjective complaints. *See e.g., id.* at 14 ("[T]he ALJ's rejection of Plaintiff's fatigue given her daily activities is improper...") and *id.* at 15 ("[T]he ALJ did not acknowledge the limitations Plaintiff placed on her ability to perform her daily activities."). Accordingly, the Court addresses both arguments below.

### A. The ALJ Did Not Err in Evaluating Dr. Ryan Van Gomple's Medical Opinion.

Plaintiff argues the ALJ failed to properly evaluate the opinion of Plaintiff's primary care physician, Dr. Ryan Van Gomple. ECF No. 16 at 7. Plaintiff contends the ALJ rejected Dr. Van Gomple's opinion with conclusory assertions and boilerplate language referring to the record as a

whole. *Id.* at 10; ECF No. 19 at 2.  Specifically, Plaintiff contends the ALJ should have found Dr.

Van Gomple's opinion well-supported because he was familiar with Plaintiff's medical history,

ECF No. 16 at 12; he treated her for diabetes, fibromyalgia, and fatigue, *id.* at 11; and Plaintiff

made subjective complaints to him regarding pain and fatigue, *id.* at 13.  Plaintiff also argues Dr.

Van Gomple's opinion is consistent with her medical record and subjective complaints.  *Id.* at 11–

12.

      In response, the Commissioner argues the ALJ "appropriately commented that Dr. Van

Gomple did not offer objective medical evidence and explanation that supported his medical

opinion." ECF No. 18 at 17–18.  Instead, Dr. Van Gomple merely "checked 'signs or symptoms'

on his form" even when the symptoms "did not appear in the record, including in his own treatment

notes." *Id.* at 18.  Thus, the Commissioner contends "the ALJ was reasonably unpersuaded" by

inconsistencies with Plaintiff's treatment history, clinical findings, and her own stated capabilities.

*Id.* at 17–18.

      Under the Social Security Administration ("SSA") regulations,[3] the ALJ must consider

each medical opinion in the record and articulate how persuasive they find the medical opinion

based on the following factors: (1) supportability; (2) consistency; (3) relationship with the

claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion.

20 C.F.R. § 404.1520c(b), (c)(1)–(5).  Supportability and consistency are "the most important

factors" in determining the persuasiveness of a medical opinion, and accordingly, the ALJ must

explain how she considered those factors in the written decision.  § 404.1520c(b)(2).  With respect

to supportability, "[t]he more relevant the objective medical evidence and supporting explanations

---

[3] Because this matter involves a claim filed after March 27, 2017, the revised regulations regarding the
evaluation of medical opinions set forth in Section 404.1520c apply in this case.  Under the new regulations,
ALJs no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical
opinion." 20 C.F.R. § 404.1520c(a).

presented by a medical source are," the "more persuasive the medical opinion[]" will be. § 404.1520c(c)(1).  As for consistency, "[t]he more consistent a medical opinion[]" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion[]" will be.  § 404.1520c(c)(2).  The ALJ may explain how she considered the other factors, including the medical source's relationship with the claimant, but is only required to do so when contradictory medical opinions regarding the same issue are equally supported by and consistent with the record.  § 404.1520c(b)(2)–(3).

In explaining her consideration, an ALJ must only show that "there is sufficient development of the record and explanation of findings to permit meaningful review," *Moore v. Astrue*, No. 2:09cv549, 2010 WL 3394657, at *6 n.12 (E.D. Va. July 27, 2010) (citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)), and she "need only review medical evidence once in [her] decision" *McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002).  As aforementioned, when reviewing the ALJ's decision for substantial evidence, this Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456).  Thus, if the undersigned finds there was substantial evidence to support the ALJ's factual findings, even if there was also evidence to support contrary findings, the ALJ's factual findings must be upheld. *Smith v. Comm'r of Soc. Sec.*, No. 4:09cv80, 2010 WL 1640271, at *1 (E.D. Va. Apr. 22, 2010).

Here, the ALJ concluded Dr. Van Gomple's medical opinion was not persuasive.  R at 19. Specifically, she concluded Dr. Van Gomple's assessments were "conclusory statements not supported by references to clinical findings in the remainder of the record" and "not consistent with the conservative, routine, and outpatient treatment history; the grossly normal clinical

18

findings discussed [in the ALJ opinion]; and the [Plaintiff's] stated ongoing capabilities." R. at 19.

First, the undersigned concludes the ALJ did not err in evaluating the supportability of Dr. Van Gomple's opinion. The ALJ's characterization of Dr. Van Gomple's opinion as "conclusory statements not supported by references to the clinical findings in the remainder of the record" is accurate given Dr. Van Gomple's failure to provide any specifics whatsoever in his medical source statement, and thus this is the most the ALJ could have said regarding supportability. R. at 19. Dr. Van Gomple checked boxes on a form and provided no references to his or any other objective findings, no notes regarding prior treatment, and no explanation to support his determination of Plaintiff's limitations. R. at 316–21. The Plaintiff argues Dr. Van Gomple's opinion is innately supported by his treatment of the Plaintiff and Plaintiff's subjective complaints, *see* ECF No. 16 at 11–13, but this is insufficient because the SSA regulations require the ALJ to consider "supporting explanations *presented by [the] medical source*," and Dr. Van Gomple provided none. § 404.1520c(c)(1) (emphasis added).

Second, the undersigned concludes the ALJ did not err in evaluating the consistency of Dr. Van Gomple's opinion. The ALJ concluded Dr. Van Gomple's opinion was "not consistent with . . . [Plaintiff's] treatment history; the grossly normal clinical findings discussed above; and the [Plaintiff's] stated ongoing capabilities." R. at 19. Prior to this conclusion, the ALJ thoroughly reviewed Plaintiff's medical record, Plaintiff's subjective statements, and State agency determinations. R. at 16–19. In support of this conclusion and in contrast to Dr. Van Gomple's medical opinion, *see supra* Section II.B., the ALJ found "[t]he primary issue in [Plaintiff's] medical records is her difficulty with controlling her blood sugar levels." R. at 18. The ALJ determined Plaintiff's blood sugar stabilized "with the use of a pump and glucose monitor," yet

"physical assessments repeatedly note[d] grossly normal musculoskeletal, neurologic, and mental functioning, as strength, sensation, gait, and ranges of motion all remained grossly normal." R. at 18. Specifically, the ALJ noted a physician's assessment from June 2021 commenting Plaintiff showed "5/5 strength in all extremities, normal sensation, and grossly normal mental status." R. at 18 (citing R. at 853). Further, the ALJ acknowledges that the Plaintiff "retains at least some capacity" to care for personal hygiene, prepare simple meals, complete chores, drive, online shop, handle her finances, read, watch television, sew, talk on the phone, and communicate with friends. R. at 18 (citing R. at 233–40).

The ALJ also included several inconsistencies, including Dr. Van Gomple's report Plaintiff can only sit or stand for two hours per day, R. at 317, compared with subjective reports that Plaintiff retained capacity for chores and other activities, R. at 16, as well as Dr. Van Gomple's report of muscle weakness and generalized pain, R. at 316, compared with physician assessments of normal strength, sensation, and range of motion, R. at 18. Furthermore, the Plaintiff does not contend there are *no* inconsistencies in the record; Plaintiff simply contends that Dr. Van Gomple's opinion *is* consistent with *some* evidence, namely her hospitalizations and personal statements of fatigue. ECF No. 16 at 11–13. However, this Court cannot "re-weigh conflicting evidence" or "substitute [its] judgment for that of the [ALJ]." *See Craig*, 76 F.3d at 589.

Although the ALJ did make somewhat conclusory statements that Van Gomple's opinion was not supported by clinical findings "in the remainder of the record" or the "normal clinical findings discussed above," R. at 19, "the ALJ need only review medical evidence once in [the] decision." *See McCartney*, 28 F. App'x at 279. Plaintiff's contention that the ALJ's evaluation of Dr. Van Gomple's opinion was too conclusory to allow for meaningful review is sufficiently refuted by the discussion above. The ALJ paid considerable attention to Plaintiff's medical

history, medical opinions, clinical findings, and subjective reports, and her decision referred back to those discussions multiple times. R. at 16–18. These discussions provided "sufficient development of the record and explanation of findings" for the undersigned to meaningfully review her conclusions. *See Moore*, No. 2:09cv549, 2010 WL 3394657, at *6 n.12. The ALJ was not required to reiterate the medical evidence in making her determination. *See McCartney*, 28 F. App'x at 279.

In summary, the ALJ appropriately evaluated the supportability and consistency factors in relation to Dr. Van Gomple's medical opinion in accordance with SSA regulations. Further, the ALJ sufficiently explained her findings that Dr. Van Gomple's opinion was not persuasive.

### B. The ALJ Did Not Err in Evaluating Plaintiff's Subjective Complaints.

Throughout her brief, Plaintiff criticizes the ALJ's consideration of her subjective complaints but did not articulate clear grounds for objection. First, Plaintiff contends the ALJ "did not acknowledge the limitations [Plaintiff] placed on her ability to perform her daily activities." ECF No. 16 at 15. Plaintiff argues by ignoring the subjective complaints, the ALJ failed to "evaluate the intensity and persistence of Plaintiff's symptoms to determine the impact they have on her ability to perform work." ECF No. 19 at 4. Second, Plaintiff contends to the extent the ALJ rejected her reports of fatigue in lieu of Plaintiff's reported daily activities, the ALJ should have explained how those daily activities showed Plaintiff is able to work, not merely get out of bed and perform some activities. ECF No. 16 at 14–15. Finally, Plaintiff argues the ALJ rejected her subjective complaints due to a lack of objective medical evidence, and the "ALJ[] may not discredit a claimant's complaints regarding fibromyalgia symptoms based on a lack of objective evidence substantiating them." ECF No. 16 at 12 (citing *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97–98 (4th Cir. 2020)).

In response, the Commissioner argues the ALJ did not ignore Plaintiff's subjective complaints because the ALJ "expressly stated her assessment was 'not limited to the objective findings.'" ECF No. 18 at 15–16 (citing R. at 18). Specifically, the Commissioner relies on the ALJ's finding that Plaintiff "retains at least some capacity to care for personal hygiene needs, prepare simple meals, . . ." R. at 18 (citing R. at 233–40). The Commissioner also contends the ALJ did not fully reject Plaintiff's reported fatigue because the "ALJ's reference to 'some capacity' acknowledges that Plaintiff did not report performing these activities on an unqualified basis[.]" ECF No. 18 at 17. The Commissioner also contends the ALJ reasonably credited Plaintiff's function report over Plaintiff's hearing testimony because "Plaintiff offered shifting reports about her activities, testifying to more limited activities at her disability hearing as compared to the function report that she previously prepared." *Id.* at 16–17.

After step three of the sequential analysis, the ALJ must determine the claimant's RFC § 404.1520(a)(4). RFC is defined as "the most" a claimant "can still do despite [her] limitations." § 404.1545(a)(1). In making the RFC determination, the ALJ must consider "all the relevant medical and other evidence" in the record and incorporate any impairments supported by objective medical evidence, and those impairments based on the claimant's complaints. § 404.1545(a)(3), 404.1529(a); *Mascio*, 780 F.3d at 635 (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)). In determining the claimant's RFC, the ALJ must "identify the individual's functional limitations" and then assess the individual's "work-related abilities on a function-by-function basis," including the claimant's physical abilities, mental abilities, and any other work-related abilities affected by her impairments. *Mascio*, 780 F.3d at 636. The ALJ must include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* The ALJ

also must "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion" in order to allow the reviewing court to evaluate the ALJ's decision. *Monroe*, 826 F.3d at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

To evaluate a claimant's subjective complaints in the context of an RFC determination, the ALJ must conduct a two-step analysis. *Arakas*, 983 F.3d at 95; § 404.1529(a). At step one, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (citing § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016)). At step two, the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and perform basic work activities. *Id.* (citing § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4). To evaluate the individual's symptoms, the ALJ looks to whether Plaintiff's subjective complaints could "'reasonably be accepted as consistent with the objective medical evidence and other evidence.'" *Craig*, 76 F.3d at 593 (citing § 404.1529c(4)). However, the ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029 at *5) (internal quotation omitted); *Walker v. Bowen*, 889 F.2d 49, 49 (4th Cir. 1989) ("there need not be objective evidence of the pain itself or the intensity."). Because symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques, at step two, the ALJ must consider the entire case record to assess the limiting effects of the individual's symptoms. *Arakas*, 983 F.3d at 595.

Here, the ALJ satisfied step one by "careful[ly] consider[ing] [] the evidence," and finding "that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the

alleged symptoms." R. at 16.  Specifically, the ALJ explained the following subjective complaints

in the record:

> [Plaintiff] described how she can not return to full time work activity as her sugar
> remains out of control even on a full-time insulin pump.  The fluctuating glucose
> levels causes her to need to sleep excessively during the day.  Additionally, when
> her sugar levels drop, she is semi-conscious, lightheaded, dizzy, and has required
> emergency treatment in the past.  [Plaintiff] described how it is hard for her to go
> to the bathroom twice per week due to dizziness.  She requires medication to assist
> with sleeping at night due to excessive napping during the day.  Neuropathy causes
> pins and needles in her hands and feet, causing trouble with holding a knife. . . .
>
> As a result of her impairments, the claimant contends that her ability to lift, squat,
> bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks,
> concentrate, and use her hands remains severely limited [R. at 238].  She continues
> to live in a two story [sic] home with her husband and pet dog.  [Plaintiff] testified
> that she completed the [twelfth] grade and retains the capacity to read magazines,
> write, count change, and manage a checking account with her husband's assistance.
> At the hearing, [Plaintiff] testified that a typical day is spent in bed, sleeping, or
> letting the dog out.  She claims that she shops for groceries once per month, washes
> a little bit of laundry, and only showers when her husband is there.  In a function
> report previously prepared for the record, [Plaintiff] stated that she otherwise has
> no problem with caring for her personal hygiene needs [R. at 234].  She could
> prepare simple meals, clean, wash laundry, drive, shop for medical supplies online,
> handle her finances, read, watch television, sew, talk on the phone, and
> communicate with friends through the computer [R. at 233–40].  She will not drive
> until she follows up with her neurologist.  [Plaintiff] contends that she continues to
> have good days only twice per week.

R. at 16.

Next, the ALJ satisfied step two by finding that Plaintiff's "statements concerning

the intensity, persistence and limiting effects of these symptoms are not entirely consistent

with the medical evidence and other evidence in the record for the reasons explained in this

decision." R. at 16.  After reviewing the medical evidence and other evidence in the record,

the ALJ explained:

> [I]n spite of [Plaintiff's] subjective allegations of pain, fatigue, and multiple bad
> days per week, the record reflects that [Plaintiff] retains at least some capacity to
> care for personal hygiene needs, prepare simple meals, clean, wash laundry, drive,
> shop for medical supplies online, handle her finances, read, watch television, sew,

talk on the phone, and communicate with friends through the computer.  Therefore, the undersigned concludes that the claimant's allegations are not entirely consistent with the adopted residual functional capacity, because they are not supported by the conservative and grossly outpatient treatment history during the period at issue, the clinical and examination findings of no acute complications, and [Plaintiff's] stated ongoing capabilities.  The light residual functional capacity with postural and environmental restrictions accounts for the chronic blood sugar irregularities, the reports of fatigue, and the concerns of possible seizure disorder.  However, it also accounts for all that [Plaintiff] can continue to do and the grossly normal physical findings discussed above.

R. at 18.

The undersigned concludes the ALJ did not err in evaluating Plaintiff's subjective complaints.  In accordance with SSA requirements for making the RFC determination, the ALJ considered Plaintiff's subjective complaints and symptoms, and found at step one, Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but, at step two, her "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  R. at 16.

The ALJ clearly enumerated all evidence, objective and subjective, taken into consideration when making her decision.  *See* § 404.1545(a)(3), 404.1529(a).  First, the ALJ considered Plaintiff's inconsistent subjective reports (e.g., "neuropathy. . . in her hands and feet, caus[es] trouble with holding a knife" and she "could prepare simple meals, clean, . . . [and] sew").  R. at 16.  The ALJ recognized that Plaintiff's capacity for preparing meals, cleaning, or sewing was not unlimited; rather, Plaintiff "retain[ed] at least some capacity" for daily activities.  Second, the ALJ extensively reviewed Plaintiff's medical evidence.  *See* R. at 16–17.  Specifically, she considered objective evidence such as Plaintiff's documented difficulty stabilizing her blood sugar, R. at 18, and multiple hospitalizations due to DKA, R. at 18, along with Plaintiff's long-standing pattern of physician discharges without follow-up evaluations, R. at 17–18, and physician reports of normal sensation, normal gait, and normal range of motion, R. at 18.

25

Notably, the ALJ did not discredit Plaintiff's subjective complaints in determining Plaintiff's RFC. R. at 18. Rather, the ALJ credited Plaintiff's reported symptoms, and explained that the RFC accounts for Plaintiff's "chronic blood sugar irregularities, [] reports of fatigue, and [] concerns of possible seizure disorder." R. at 18. Accordingly, the ALJ did not err in evaluating Plaintiff's subjective complaints at step one or two of her analysis. To the extent that the Plaintiff argues the ALJ did not take relevant subjective evidence into consideration, this Court in unpersuaded in light of the extensive attention the ALJ paid to Plaintiff's history and record. *See* R. at 16–18.

Plaintiff takes specific issue with the ALJ's analysis of her symptoms with respect to Plaintiff's fibromyalgia diagnosis. ECF No. 16 at 12–15. Plaintiff contends the ALJ did not explain why Plaintiff's fibromyalgia, which can be characterized by "chronic fatigue, tiredness, numbness, tingling, depression, nausea, [and] seizures," did not provide adequate support for Dr. Van Gomple's opinion.[4] *Id.* at 13. Due to her fibromyalgia, Plaintiff argues she is "entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of [her] symptoms." ECF No. 16 at 12 (citing *Arakas*, 983 F.3d at 98). Especially when evaluating symptoms related to fibromyalgia, "a disease whose 'symptoms are entirely subjective,'" an ALJ cannot require subjective complaints be supported by objective medical evidence. *Arakas*, 983 F.3d 83, 96.

However, Plaintiff's argument is unavailing for several reasons. First, information related to Plaintiff's fibromyalgia diagnosis is notably absent from medical treatment, physician notes,

---

[4] To the extent Plaintiff argues the ALJ should have found Plaintiff's fibromyalgia diagnosis and subjective statements alone sufficient to conclude Dr. Van Gomple's medical opinion was consistent with the record, the ALJ was not required to evaluate the extent a particular *diagnosis* was consistent with the opinion. The ALJ appropriately evaluated the limitations enumerated in the opinion with the *symptoms* evidenced by the remainder of the record. *See supra* Section V.A.

and Plaintiff's testimony of her alleged disability.  Plaintiff's doctors acknowledge few of her subjective complaints, and to the extent they do (through objective evidence or otherwise), her doctors do not attribute the symptoms to fibromyalgia. *See e.g.*, R. at 338–39, 497–98, 562–66, 793–98, 845, 1188, 1205.  Second, the ALJ did not disregard Plaintiff's subjective complaints "solely because the objective medical evidence [did] not substantiate" them. *See Arakas*, 983 F.3d at 95.  Rather, the ALJ noted that Plaintiff's subjective complaints were not entirely consistent with the objective medical evidence *and* other evidence in the record, including Plaintiff's own statements about her capabilities. *See Arakas*, 983 F.3d at 95 ("the ALJ must consider the entire case record").  Finally, and most importantly, the ALJ did not disregard or discredit Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms because they were not consistent with the objective medical evidence or otherwise. *See Arakas*, 983 F.3d at 95.  Rather, the ALJ detailed all of Plaintiff's subjective allegations, and explained that Plaintiff's RFC "accounts for . . . [Plaintiff's] reports of fatigue." R. at 18.  To the extent the Plaintiff argues the ALJ should have relied exclusively on some of Plaintiff's subjective statements when those statements conflict with other subjective statements or with other evidence, again, the Court cannot "reweigh the evidence" or "substitute [its] judgement for that of the [ALJ]." *See Craig*, 76 F.3d at 589.

In summary, the ALJ did not err in evaluating Plaintiff's subjective complaints and did not fail to create a logical bridge between the evidence to his conclusion and the RFC.  The ALJ extensively reviewed the evidence in concluding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms were not entirely consistent with the other medical evidence in the record.  Ultimately, the ALJ did not discredit Plaintiff's

complaints of fatigue, but rather crafted an RFC to account for that symptom, and accordingly, did not err in evaluating Plaintiff's subjective complaints.

## VI. **RECOMMENDATION**

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 15, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 17, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## VII. **REVIEW PROCEDURE**

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
July 11, 2023